IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Beulyta Doyle,  )<br>  )<br>           Plaintiff,   )<br>  )<br>      vs.   )<br>  )<br>Michael J. Astrue,   )<br>Commissioner of Social Security,   )<br>  )<br>           Defendant.   )<br>_____ ) | Civil Action No. 6:07-3497-HFF-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed a previous application for disability insurance benefits (DIB) on July 3, 2003, alleging she became unable to work on February 3, 1999. This claim was denied through the hearing level, with the decision of the administrative law judge (ALJ) on November 26, 2004.

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

The plaintiff filed her current application for disability insurance benefits on December 21, 2004, alleging that she became unable to work on November 27, 2004 (later amended to January 17, 2002). The application was denied initially and on reconsideration by the Social Security Administration. On October 19, 2005, the plaintiff requested a hearing. The ALJ, before whom the plaintiff, her attorney, and a vocational expert appeared on June 28, 2006, considered the case *de novo*, and on September 12, 2006, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on August 24, 2007. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant last met the insured status requirements of the Social Security Act on December 31, 2004.
>
> (2)    The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of January 17, 2002 through her date last insured of December 31, 2004 (20 CFR 404.1520(b) and 404.1571 *et seq*.).
>
> (3)    Through the date last insured, the claimant had the following severe impairment: status-post discectomy and decompression with fusion at C4-5 and C5-6 (20 CFR 404.1520(c)).
>
> (4)    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404. 1525 and 404.1526).
>
> (5)    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work. The claimant could lift and carry no more than 10 pounds at a time and could occasionally lift and carry articles like docket files, ledgers, and small tools. The claimant could sit

2

for six hours in an eight-hour workday and stand and/or walk for two hours in an eight-hour workday. The claimant was limited to a sit/stand option. The work was not to involve climbing ladders/scaffolds/ropes.  The work was not to  involved balancing, standing, bending, or crouching. The claimant was limited to occasionally working overhead.  The claimant could not perform repetitive work with one upper extremity.  The work was not to involve hazards.

(6)     Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

(7)     The claimant was born on July 14, 1961 and was 43 years old on the date last insured, which is defined as a younger individual age (20 CFR 404.1563).

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9)     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

(10)    Through the dated [sic] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

(11)    The claimant was not under a "disability," as defined in the Social Security Act, at any time from January 17, 2002, the amended alleged onset date, through December 31, 2004, the date last insured (20 CFR 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who

3

are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

4

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 43 years old on December 31, 2004, when she was last insured for benefits (Tr. 50). She has a high-school education and has worked as a rug braider and spring winder operator (Tr. 65, 71).

### *Medical Treatment Prior to December 31, 2004*

The record reveals that Dr. William E. Wilson treated the plaintiff with medication, physical therapy, and nerve-block injections for impingement syndrome of the

5

right shoulder from 1997-2000 (Tr. 184-87). The plaintiff underwent arthroscopic surgery for right-shoulder-impingement syndrome in February 2000 on Dr. Wilson's recommendation (Tr. 94-97, 182, 185). She reported no improvement from the surgery (Tr.101-07, 177-80). In April 2001, she underwent three cervical epidural steroid injections for radicular pain after an MRI showed a mild bulging disc without herniation at C5-6 (Tr. 89-93). She reported only slight improvement from the injections (Tr. 99).

On January 17, 2002, Dr. Wilson performed a C4-5/C5-6 cervical discectomy and fusion on the plaintiff after a myelogram showed compression of the thecal sac at C3-4 through C5-6. Before the surgery, Dr. Wilson noted that the plaintiff had had persistent pain radiating from her neck into her right shoulder, arm and hand, and that conservative treatment with medication, injections and physical therapy had failed (Tr. 116-20, 125-29).

In April 2002, Dr. Wilson noted that the plaintiff's arm pain was "significantly improved" after a course of physical therapy, but she complained of discomfort in the right parascapular and trapezius area and of pain when driving and with neck rotation. Examination revealed no motor deficits, decreased tenderness in the paraspinal muscles and improved range of motion. Dr. Wilson stated that he felt the plaintiff could "do sedentary or clerical work [with limited] flexion/extension of the next and limit[ed] lifting" (Tr. 174).

In June 2002, Dr. Wilson assigned the plaintiff a 10 percent whole person impairment related to the cervical spine, and stated that her work restrictions consisted of "sedentary clerical work w/ ten pound maximum lifting and avoid repetitive overhead activity" (Tr. 173).

In January 2003, Dr. Wilson saw the plaintiff on a referral from her primary care physician for evaluation of complaints of low-back pain. The plaintiff complained of pain radiating from her lower back to her left leg and foot since a motor vehicle accident in September 2001. Dr. Wilson found she had a nonantalgic gait, full strength and normal sensory function in the lower extremities, and limited range of motion in the back. Dr. Wilson

ordered an MRI of the plaintiff's lumbar spine, which was interpreted as normal (Tr. 114, 172).

In April 2003, the plaintiff returned to Dr. Wilson with complaints of pain in the right neck, shoulder, arm and hand. After finding no motor deficits in the upper extremities and multiple trigger points, Dr. Wilson prescribed physical therapy and ordered an MRI, which showed a small disc protrusion at C3-4 and spurring at C4-5 and C5-6 without significant evidence of central-canal or neural-foraminal narrowing. Dr. Wilson administered a nerve block injection in the plaintiff's right shoulder in June 2003, when she presented with complaints of continued right neck and shoulder pain. The plaintiff reported no relief from the injection (Tr. 112-13, 170-71).

On November 3, 2003, Dr. Jeffrey E. Faaberg Sr., a pain management specialist, noted that the plaintiff was not taking Ultracet but had started using an RS Medical stimulator. He found her examination unchanged and use of her upper extremities significantly improved, and stated that he had "little more to offer her." The plaintiff returned to Dr. Faaberg later in November, reporting some improvement in her right arm pain. With regard to employment, Dr. Faaberg stated that the plaintiff "may be a candidate for vocational rehabilitation but repetitive use of the upper extremities on a long-term basis is not possible." When Dr. Faaberg examined the plaintiff on December 30, 2003, she complained of continuing neck pain. He found she had tenderness, tightness and reduced range of motion in the cervical spine, and he administered a cervical facet-joint injection (Tr. 152-54).

The plaintiff returned to Dr. Wilson concerning neck and shoulder pain in March 2004, stating that physical therapy had been helpful but had not relieved her symptoms. Dr. Wilson found tenderness in the right shoulder-trapezius area, a positive impingement sign, good range of motion, and some weakness. He recommended continued treatment with Dr. Faaberg (Tr. 169).

7

Dr. James D. Dalton Jr. examined the plaintiff in March 2004 at Dr. Wilson's request and found she had no coordination deficits, full strength with shoulder rotation and abduction, and mildly positive impingement signs.  Dr. Dalton injected the plaintiff's right shoulder and diagnosed right shoulder pain of unclear etiology.  In April 2004, Dr. Dalton noted that an MRI of the plaintiff's right shoulder looked "relatively normal" and told her that her problem was not surgically correctable (Tr. 167-68).

On August 26, 2004, the plaintiff saw Dr. Faaberg and reported an increase in right-sided radicular pain.  Dr. Faaberg found the plaintiff had "myofascial findings" in the upper back and periscapular muscles, and sensory changes in the right arm.  He administered an epidural-steroid injection.  Dr. Faaberg administered another epidural-steroid injection to the plaintiff in November 2004, noting she had responded to injections in the past.  When the plaintiff reported continuing neck pain to Dr. Faaberg on December 13, 2004, he noted she had a "generalized myofascial condition in the upper back and posterior cervical area."  He stated that the plaintiff had reached maximum medical improvement and recommended heat, exercise and a cervical support pillow to help her sleep, and no further physical therapy or injections (Tr. 148-50).

### *Medical Treatment After December 31, 2004*

In April 2005, Dr. Joseph Gonzalez, a state agency physician, assessed the plaintiff's residual functional capacity.  Dr. Gonzalez concluded that the plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours, and sit for six hour in an eight-hour workday.  He stated that the plaintiff's condition also precluded frequent, overhead use of the upper extremities, "infrequent hard pedals" with the left lower extremity, and more-than-occasional climbing, balancing, stooping, kneeling, crouching and crawling (Tr. 155-62).

In July 2005, Dr. Wilson found that the plaintiff had mildly-to-moderately decreased range of cervical motion, tenderness in the neck and trapezius muscles, "some mild impingment" and intact rotator cuff strength. He diagnosed chronic neck and bilateral shoulder pain and prescribed medication (Tr. 167).

In August 2005, the plaintiff complained to Dr. Wilson of pain in the left side of her neck radiating to her left arm and hand. Dr. Wilson recommended epidural steroid injections. After two injections, the plaintiff complained in September 2005 of continuing intermittent pain in the right arm and related she had been unable to complete a vocational rehabilitation test because of pain in her right arm. Dr. Wilson found no motor deficits throughout the upper extremities (Tr. 166).

In September 2005, Dr. Jean V. Smolka, a state agency physician, assessed the plaintiff's residual functional capacity in September 2005. Dr. Smolka concluded that the plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours, and sit for six hour in an eight-hour workday. Dr. Smolka stated that the plaintiff was limited to occasional overhead reaching with the upper extremities and occasional climbing, balancing, stooping, kneeling, crouching and crawling (Tr. 188-95).

Dr. J. Edward Nolan treated the plaintiff in five appointments between August 31, 2005, and March 7, 2006. The plaintiff complained of constant pain in her neck and arms, aggravated by housework and lifting, and stated that injections had provided good relief in the past. Dr. Nolan noted that the plaintiff's medications consisted of Zelnorm (indicated for irritable bowel syndrome), Thiazide (indicated for hypertension), and Verelan (indicated for hypertension). His examination findings included normal coordination and muscle tone; grossly intact sensation in all extremities; pain in the C5 nerve root distribution; decreased sensation to light touch in all right cervical dermatomes; absent right brachio radialis reflex; grossly intact motor function in the upper extremities, with decreased (4+/5)

9

strength in the right lower extremity; and moderate radiculopathy in the C5-6 nerve-root distribution (Tr. 196-207).

In responses to a questionnaire completed in June 2006, Dr. Faaberg indicated that the plaintiff was incapable of full-time work prior to December 31, 2004, and that she would have missed more than four days of work per month and required frequent breaks during the workday had she attempted to work before that date. Dr. Faaberg also indicated that the plaintiff's belief that she needed to rest and/or lie down after 20-to-30 minutes of light activity was reasonable (Tr. 208-09).

By March 7, 2007, the plaintiff rated her pain as a "10" on a scale of 1 to 10, with 10 being the worst. Dr. Nolan treated the plaintiff with epidural steroid injections, cervical facet-joint injections, and a sub-acromial bursa injection (Tr. 196-200).

***Hearing Testimony***

At the hearing on June 28, 2006, the plaintiff testified that her condition had not changed significantly since January 2002 (Tr. 225). She testified that her 2002 neck surgery "helped a little bit," but that she still had constant neck and right-arm pain (Tr. 225-27). She testified that she could not reach overhead and had numbness and decreased grip strength in her right hand (Tr. 227-28). She stated that she could stand for 20 minutes and sit for 30 minutes, that she needed to lie down throughout the day, and that she slept only three-or-four hours per night (Tr. 228-32).

The ALJ asked Arthur F. Schmitt, Ph.D., a vocational expert, to consider a person of the plaintiff's age, education and work experience who could perform sedentary work with a sit/stand option; could not climb, balance, stoop, bend, kneel crouch, or crawl; could only occasionally perform overhead work; could not perform repetitive work with one arm; and could not be exposed to hazardous conditions such as unprotected heights (Tr.

233).  Dr. Schmitt testified that such a person could perform the unskilled sedentary jobs of surveillance system monitor and telephone quotation clerk (Tr. 234).

## ANALYSIS

The ALJ found that the plaintiff retained the residual functional capacity ("RFC") to perform sedentary work with the limitations of a sit/stand option; no climbing ladders/scaffolds/ropes; no balancing, standing, bending, or crouching; only occasionally working overhead; no hazards; and no repetitive work with one upper extremity.  The plaintiff argues that the ALJ erred by (1) failing to perform a proper listing analysis; (2) failing to consider whether her combined impairments are of equal medical significance to a listed impairment; (3) failing to properly assess her credibility; (4) failing to properly consider the opinion of her treating physician; and (5) failing to consider all of her impairments in assessing her residual functional capacity ("RFC").

### *Listing 1.04*

The plaintiff argues that the ALJ failed to properly consider her impairments under Listing 1.04.  Listing 1.04 provides in pertinent part:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in a compromise of a nerve root (including the cauda equina) or the spinal cord.
> With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> ***

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04.

To establish that a listing is met, the medical criteria must be met for a period of 12 continuous months. *See* Social Security Ruling (SSR) 86-8 ("Thus, when such an individual's impairment or combination of impairments meets or equals the level of severity described in the Listing, and also meets the duration requirement, disability will be found . . . .").

> The ALJ found as follows:
>
> In order to meet section 1.04 of the Listing of Impairments, there must be evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weaknesses) accompanied by sensory or reflex loss and positive straight leg raising test, sitting and supine. Although the claimant had cervical surgery in January 2002, by June 26, 2002 the claimant was discharged with a sedentary limitation with ten pound maximum lifting and avoidance of repetitive overhead activity. When seen in April 2003, she had a mildly diminished cervical range of motion, tenderness about the incision, and no swelling or erythema. There were no true motor deficits in the upper extremities. There were no long track signs. X-rays showed solid fusion at C4-5 and C5-6. When last seen by Dr. Faaberg on December 13, 2004, the claimant had reduced range of motion of the cervical spine and some sensory change in the right upper extremity. Therefore, the undersigned Administrative Law Judge finds that the severe neck impairment does not meet the criteria of this Listing.

(Tr. 22).

The ALJ's finding that the plaintiff's impairments did not meet Listing 1.04(A) is supported by substantial evidence. The ALJ correctly found that the plaintiff's impairment of the cervical spine resulted in "no true motor deficits in the upper extremities" (Tr. 22). In April 2002, April 2003, and August 2005, Dr. Wilson found the plaintiff had no motor deficits in the upper extremities (Tr. 166, 171, 174). Dr. Faaberg's records contained no findings of motor loss (Tr. 148-54). Because the evidence failed to establish the plaintiff had motor loss in the upper extremities, the ALJ correctly determined that she failed to meet the listing. As argued by the defendant, while the plaintiff cites numerous medical findings in support of her

12

argument that she meets listing 1.04(A), she does not identify a single finding of motor loss during the time period relevant to her claim (pl. brief 15-19). Based upon the foregoing, this claim of error fails.

The plaintiff next argues that the ALJ failed to consider the combined effect of her impairments and whether the combined impairments were of equal medical significance to a listed impairment. Specifically, the plaintiff argues that the ALJ did not consider her right shoulder impairment and chronic pain in combination with her severe spine impairment (pl. brief 19-22).

> In no case are symptoms alone a sufficient basis for establishing the presence of a physical or mental impairment.
>
> Any decision as to whether an individual's impairment or impairments are medically the equivalent of a listed impairment must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the [Commissioner]. The Disability Determination Services physician's documented medical judgment as to equivalency meets this regulatory requirement.

SSR 86-8, 1986 WL 68636, *4. In a disability case, the combined effect of all a claimant's impairments must be considered without regard to whether any such impairment, if considered separately, would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Here, the medical evidence shows that the plaintiff sought medical treatment for chronic pain and difficulties with her neck, right shoulder, arm, and hand. However, the ALJ did not explain why the plaintiff's impairments in combination did not equal a listed impairment (Tr. 22, Finding 4). As the Fourth Circuit Court of Appeals has stated, "[T]his Court has on numerous occasions held that in evaluating the effective of various impairments upon a disability benefit claimant, the Secretary must consider the combined effect of a claimant's impairments and not fragmentize them. . . . As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir.1985)). The defendant argues that the ALJ was not required to address whether the impairments equaled a particular listing. However, the court in *Walker* stated,

> Congress explicitly requires that "the combined effect of all the individual's impairments" be considered, "without regard to whether any such impairment if considered separately" would be sufficiently severe, 42 U.S.C. § 423(d)(2)(c), *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir.1989). Therefore, a failure to establish disability under the listings by reference to a single, separate impairment does not prevent a disability award.

*Id.* at 49. Accordingly, the ALJ should have considered the plaintiff's impairments in combination. The defendant also notes that two State agency physicians indicated the plaintiff's condition did not meet or equal the requirements of a listed impairment (def. brief 13-14). However, the defendant's *post hoc* rationalizations for the ALJ's finding are inappropriate. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Accordingly, upon remand, the ALJ should be instructed to evaluate the combined effect of the plaintiff's impairments and whether the impairments equal the requirements of a listed impairment.

*Credibility*

The plaintiff next argues that the ALJ failed to properly assess her credibility. A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)  the individual's daily activities;

(2)  the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)  factors that precipitate and aggravate the symptoms;

(4)  the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)  treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)  any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)  any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found that while the plaintiff's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (Tr. 25).  The ALJ further found that the "claimant's allegations have been inconsistent with the medical evidence of record, the claimant's reports to her physicians, and the treatment sought and received for the period through December 31, 2004 (date disability insurance status expired)" (Tr. 26).  Specifically, the ALJ noted that the plaintiff's daily activities were not "limited to the extent one would expect" given her complaints, that the plaintiff "had not been entirely compliant in taking prescribed medications," that surgery on the plaintiff's neck was generally successful in relieving her symptoms, and that there was a significant gap in the plaintiff's history of treatment (Tr. 26).

The plaintiff does not argue that the ALJ considered inappropriate factors in assessing her credibility.  Rather, she argues that the ALJ ignored and misstated the record in evaluating her credibility (pl. brief 22-26).  This court agrees with the plaintiff that the ALJ did err in misstating evidence relating to her credibility.  The defendant's citation of evidence showing the plaintiff's lack of pain medication is a *post hoc* rationalization, as lack of pain medication was not cited as a basis for the ALJ's credibility finding.  With regard to the plaintiff's daily activities, the ALJ stated that the plaintiff testified on August 23, 2004, that her activities of daily living included washing dishes, vacuuming, sweeping, washing clothes, and attending church on some Sundays (Tr. 26).  However, both the plaintiff and this court have reviewed the record without success to try to find the testimony to which the ALJ refers (pl. brief 23).  Further, the gap in treatment between April 8, 2004, and July 8, 2005, that was cited by the ALJ was in error because during that time period the plaintiff was receiving treatment from Dr. Faaberg at a pain center (Tr. 148-50).  The ALJ also noted that the plaintiff's neck symptoms were relieved by surgery.  However, it does not appear that the

ALJ considered the evidence that the plaintiff's neck pain continued following her surgery (Tr. 152-54, 169, 171-75; pl. brief 25-26). Also, the ALJ stated that the plaintiff "had not been entirely compliant with taking prescribed medications," noting that she reported to Dr. Faaberg on November 3, 2003, that she had not been taking Ultracet recently (Tr. 26; *see* Tr. 154). However, as argued by the plaintiff, Dr. Faaberg did not state that the plaintiff was being noncompliant; he simply stated that she had not taken the Ultracet recently. A review of the treatment notes immediately following this visit show that the plaintiff was in the process of being weaned off of the Ultracet, and she was starting to use an RS medical stimulator (Tr. 153-54).

Based upon the foregoing, upon remand, the ALJ should be instructed to reevaluate the evidence of record in assessing the plaintiff's credibility in accordance with the above-cited law.

### *Treating Physician*

The plaintiff argues that the ALJ failed to properly consider the opinion of her treating physician, Dr. Faaberg. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

In response to a questionnaire completed in June 2006, Dr. Faaberg, a pain management specialist, indicated that the plaintiff was incapable of full-time work prior to December 31, 2004, and that she would have missed more than four days of work per month and required frequent breaks during the workday had she attempted to work before that date. Dr. Faaberg also indicated that the plaintiff's belief that she needed to rest and/or lie down after 20-to-30 minutes of light activity was reasonable (Tr. 208-09).

The plaintiff had apparently been Dr. Faaberg's patient since at least 1999. In a visit on November 18, 2003, Dr. Faaberg referenced his 1999 independent medical evaluation of the plaintiff (Tr. 153). Dr. Faaberg last treated the plaintiff in December 2004.

The ALJ stated in his decision that he accorded "little weight to Dr. Faaberg's responses of June 27, 2006." He noted that Dr. Faaberg indicated that the plaintiff's condition would have limited her activities, that she would have to take frequent breaks, and that she would not have been capable of working an eight-hour day, but found that Dr. Faaberg's "examinations from November 3, 2003, to December 13, 2004, do not reflect findings that would have restricted the claimant to this degree. His records do not show that he placed any restrictions on the claimant's activities. Notably, there is no clinical evidence given that shows the claimant was seen at any point between December 13, 2004, and June 27, 2006" (Tr. 26). The ALJ cited the findings of the state agency medical consultants who opined that the plaintiff was not disabled and gave those opinions "some weight as they are supported by the medical evidence of record" (Tr. 27).

The plaintiff argues that Dr. Faaberg's opinion was well supported and consistent with the record as a whole. As he is a pain management specialist and treated the plaintiff for at least five years, the plaintiff argues that the ALJ did not properly consider his opinion. The defendant argues that the ALJ's decision to give Dr. Faaberg's opinion little weight was supported by substantial evidence, and this court agrees. As noted by the defendant, the plaintiff has submitted no records of treatment by Dr. Faaberg prior to November 2003 (Tr. 148-54). Dr. Faaberg's records of treatment from November 2003 through December 2004 do not contain findings consistent with total disability and do not show he placed such restrictions on her activity during the period in which he treated the plaintiff (Tr. 148-54). Based upon the foregoing, the ALJ did not err in giving little weight to Dr. Faaberg's opinion.

### *Residual Functional Capacity*

The plaintiff next argues that the ALJ erred in failing to consider all of her impairments in assessing her RFC. Specifically, the plaintiff complains that the ALJ did not

19

include the limitation of no repetitive use of both the upper extremities in her RFC and in the hypothetical question to the vocational expert. In December 2003, Dr. Faaberg told the plaintiff that she "may be a candidate for vocational rehabilitation but repetitive use of the upper extremities on a long-term basis is not possible" (Tr. 153). In his finding of RFC, the ALJ limited the plaintiff to sedentary work with, among other restrictions, limitations to only "occasionally working overhead" and no "repetitive work with one upper extremity" (Tr. 22-23). The plaintiff argues that the ALJ erred by not limiting her to no repetitive work with both upper extremities. However, as argued by the defendant, during the relevant time period (January 17, 2002, to December 31, 2004), the plaintiff complained to Drs. Wilson and Faaberg of symptoms in her right upper extremity only (Tr. 148-54, 167-75). Dr. Faaberg's records contain no reference to complaints or abnormal findings related to the plaintiff's left arm (Tr. 148-54). Further, the ALJ did place restrictions on the plaintiff's use of both arms by limiting her to occasional overhead work (Tr. 22), which concurs with the opinion of the plaintiff's other treating physician, Dr. Wilson, who limited the plaintiff to "sedentary clerical work with ten pound maximum lifting and avoid repetitive overhead activity" (Tr. 173). Based upon the foregoing, this allegation of error is without merit.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

December 1, 2008                                         s/William M. Catoe
Greenville, South Carolina                          United States Magistrate Judge